FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

10 JAN 29 PH 4:27

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

**CV 10-    0399**

| | |
|---|---|
| RONALD GROSS,<br><br>             Plaintiff,<br><br>v.<br><br>THOMAS V. REIFENHEISER, CHARLES F. DOLAN, JAMES L. DOLAN, KATHLEEN M. DOLAN, BRAD DORSOGNA, MARIANNE DOLAN WEBER, PATRICK F. DOLAN, THOMAS C. DOLAN, DEBORAH DOLAN-SWEENEY, BRIAN G. SWEENEY, RAND V. ARASKOG, FRANK BIONDI, ZACHARY W. CARTER, CHARLES D. FERRIS, JOHN R. RYAN, VINCENT TESE, and LEONARD TOW,<br><br>             Defendants,<br><br>and,<br><br>CABLEVISION SYSTEMS CORPORATION,<br><br>             Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. _____

WEXLER, J.

TOMLINSON, M.J.

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff brings this action derivatively, pursuant to Fed. R. Civ. P. 23.1, on behalf of

Cablevision Systems Corporation ("Cablevision" or the "Company"), for injunctive relief against

Defendants and alleges as follows based upon personal knowledge as to himself and on

information and belief as to all other matters based upon the investigation of his counsel, which

included a review of filings with the Securities and Exchange Commission (the "SEC"),

conference call transcripts with analysts, news items and other public information. Plaintiff

believes that further evidence will be forthcoming upon a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Plaintiff brings this action to enjoin defendants' continued violation of the prohibition of "interlocking directorships." Section 8 of the Clayton Act ("Section 8"), 15 U.S.C. § 19, prohibits a person from serving as a director or officer of two or more corporations if: (a) the combined capital, surplus and undivided profits of each of the corporations exceeds $25,841,000;[1] (b) each corporation is engaged in commerce; and (c) the corporations are competitors with certain threshold competitive annual sales. Although the statute contains some exemptions, none apply here.[2] The reason for this prohibition is that if competing organizations share officers or directors, there is a high likelihood that the organizations will not compete with one another, or not compete aggressively.

2.      Cablevision (including its subsidiaries) is the fifth largest cable company in the United States and operates cable programming networks, telecommunications companies, entertainment businesses and a newspaper publishing business. Significant portions of the Company's revenues are derived from cable services and advertising. As a result, Cablevision competes in the areas of video, high-speed data, voice and advertising with, among others, the following companies:

    a)      Citadel Broadcasting Corporation ("Citadel"), the third largest radio

---

[1] This statutory threshold is adjusted every year as determined by the Department of Commerce and published by the Federal Trade Commission (the "FTC"). 15 U.S.C. § 19(a)(5). On January 19, 2010, the FTC announced this new threshold amount.

[2] Exempted from Section 8's prohibitions are interlocks for which: (1) the competitive sales of either corporation are less than $1 million (or as of January 19, 2010: $2,584,100); (2) the competitive sales of either corporation are less than 2 percent of that corporation's total sales; or, (3) the competitive sales of each corporation are less than 4 percent of that corporation's total sales. 15 U.S.C. § 19(a)(2)(A)-(C). The term "competitive sales" is defined as "the gross revenues for all products and services sold by one corporation in competition with the other, determined on the basis of annual gross revenues for such products and services in that corporation's last completed fiscal year" and the term "total sales" means "the gross revenues for all products and services sold by one corporation over that corporation's last completed fiscal year." 15 U.S.C. § 19(a)(2). As explained herein, none of these exemptions apply in this action.

broadcasting company in the United States, with substantial revenue from advertising.

b)     Lamar Advertising Company ("Lamar"), one of the largest outdoor advertising companies in the United States.

c)     Mediacom Communications Corporation ("Mediacom"), the eighth largest cable company in the United States, with substantial revenue from video, high-speed data, voice and advertising.

3.     Serving on Cablevision's Board of Directors (the "Board") and on the boards of Citadel, Lamar and Mediacom is Thomas V. Reifenheiser ("Reifenheiser"), an interlocking director within the meaning of Section 8. This action is brought derivatively on behalf of Cablevision to enforce Section 8 and enjoin this illegal interlock.

4.     A pre-suit demand on the Cablevision Board is futile and excused. First, a majority of the seventeen members of the current Board are members of the Dolan family who control Cablevision and its Board and thus lack sufficient independence to require a pre-suit demand on the Board. Second, a majority of the current Board nominated Reifenheiser to the Board in 2009 and recommended that Cablevision shareholders vote for him, in violation of Section 8. Because a majority of the current Board committed these void and *ultra vires* acts by allowing Reifenheiser to continue to serve on the Cablevision Board and in nominating him for election to the Board with a recommendation that shareholders vote for him, a pre-suit demand on the current Board would be futile and is excused.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction of this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 8 of the Clayton Act, 15 U.S.C. § 19. The Court has supplemental jurisdiction over Plaintiff's state-law claim alleged in Count Two.

6.     Original jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331,

3

1337. The Court also has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367.

7.     Venue is laid in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

## PARTIES

8.     Plaintiff is, and has been at all relevant times, a shareholder of Cablevision.

9.     Nominal Defendant Cablevision is a Delaware corporation with principal executive offices at 1111 Stewart Avenue, Bethpage, NY 11714.

10.     Defendant Charles F. Dolan ("C. Dolan") has been a Director and Chairman of the Company since 1985, and Chief Executive Officer of the Company from 1985 to October 1995. C. Dolan founded and acted as the General Partner of the Company's predecessor from 1973 to 1985, established Manhattan Cable Television in 1961 and Home Box Office in 1971. C. Dolan is the father of James L. Dolan, Patrick F. Dolan, Deborah Dolan-Sweeney, Kathleen M. Dolan, Marianne Dolan Weber and Thomas C. Dolan.  C. Dolan is also the father-in-law of Brad Dorsogna and Brian G. Sweeney.

11.     Defendant James L. Dolan ("J. Dolan") has been a Director of the Company since 1991, President of the Company since June 1998 and Chief Executive Officer of the Company since October 1995. J. Dolan has been Chairman of Madison Square Garden since October 1999, Chief Executive Officer of Rainbow Media Holdings, Inc., a subsidiary of the Company, from September 1992 to October 1995, and Vice President of the Company from 1987 to September 1992.

12.     Defendant Kathleen M. Dolan ("K. Dolan") has been a Director of the Company since 2007.

13.     Defendant Brad Dorsogna ("Dorsogna") has been a Director of the Company since 2008. Dorsogna is the owner and Executive Producer of Artistree Productions since 1997.

4

Dorsogna is the spouse of K. Dolan.

14.     Defendant Marianne Dolan Weber ("Weber") has been a Director of the Company since 2005.

15.     Defendant Patrick F. Dolan ("P. Dolan") has been a Director of the Company since 1991, President of News 12 Networks of the Company since February 2002, Vice President of News from September 1995 to February 2002, and News Director of News 12 Long Island, a subsidiary of the Company, from December 1991 to September 1995.

16.     Defendant Thomas C. Dolan ("T. Dolan") has been a Director of the Company since 2007, Executive Vice President-Strategy and Development, Office of the Chairman since September 2008, and Executive Vice President and Chief Information Officer of the Company from October 2001 until April 2005. T. Dolan was on unpaid leave of absence from April 2005 until September 2008, Senior Vice President and Chief Information Officer of the Company from February 1996 to October 2001, Vice President and Chief Information Officer of the Company from July 1994 to February 1996, General Manager of the Company's East End Long Island cable system from November 1991 to July 1994, System Manager of the Company's East End Long Island cable system from August 1987 to October 1991. T. Dolan also served as a Director of the Company from March 1998 to May 2005.

17.     Defendant Deborah Dolan-Sweeney ("Dolan-Sweeney") has been a Director of the Company since 2008, Director of Dolan Family Foundation since 1986, and Director of Dolan Children's Foundation since 1997.

18.     Defendant Brian G. Sweeney ("Sweeney") has been a Director of the Company since 2005, and Senior Vice President eMedia of the Company since January 2000.  Sweeney is the spouse of Dolan-Sweeney.

19.     Defendant Rand V. Araskog ("Araskog") has been a Director of the Company

since 2005. Araskog is self-employed as a private investor as principal in RVA Investments since March 1998.

20.   Defendant Frank Biondi ("Biondi") has been a Director of the Company since 2005.

21.   Defendant Zachary W. Carter ("Carter") has been a Director of the Company since 2006. Carter is a partner at the law firm of Dorsey & Whitney LLP, in New York, New York since 1999. For 2008, Carter earned over $540,000 in cash and stock for his service as a Cablevision Director.

22.   Defendant Charles D. Ferris ("Ferris") has been a Director of the Company since 1985. Ferris is a non-equity partner in the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin"). In 2006, 2007 and 2008, the Company paid Mintz Levin approximately $3,862,350, $3,983,968, and $3,399,973, respectively, for legal services. Ferris was Chairman of the Federal Communications Commission from October 1977 to April 1981. Ferris has been a Trustee Associate/Trustee of Boston College continuously since 1986. Ferris is also a Director of the Board of The Maureen and Mike Mansfield Foundation. For 2008, Ferris earned $174,000 in cash and stock for his service as a Cablevision Director.

23.   Vice Admiral Defendant John R. Ryan USN (Ret.) ("Ryan") has been a Director of the Company since 2002. For 2008, Ryan earned over $223,000 in cash and stock for his service as a Cablevision Director.

24.   Defendant Vincent Tese ("Tese") Director of the Company since 1996. Tese served as Chairman and Chief Executive Officer of the New York State Urban Development Corporation from 1985 to 1987 and as Director of Economic Development for New York State from 1987 to December 1994. Since 2005, Charles Tese, the brother of V. Tese, has been employed by Madison Square Garden, L.P., a subsidiary of the Company, in a non-executive

officer position. Charles Tese earned a salary of $104,210 and a bonus of $4,022 in 2008. For 2008, Tese earned over $219,000 in cash and stock for his service as a Cablevision Director.

25.     Defendant Leonard Tow ("Tow") has been a Director of the Company since 2005. Tow is Chief Executive Officer of New Century Holdings LLC, an outdoor advertising company, since January 2005, and director of Citizens Communications Company from 1989 to September 2004. Tow is Chairman and Chief Executive Officer of Citizens Communications Company from 1990 to September 2004.

26.     Defendant Thomas V. Reifenheiser ("Reifenheiser") has been a Director of the Company since 2002, was a member of the Company's Audit Committee and is a member of the Company's Compensation Committee. Reifenheiser retired as a Managing Director of JP Morgan Chase, overseeing the Global Media and Telecommunications Division in September 2000 after 38 years with JP Morgan Chase and its predecessors. Reifenheiser is also a director of Citadel (since 2007), Lamar (since 2000) and Mediacom (since 2000). For 2008, Reifenheiser earned over $236,000 in cash and stock for his service as a Cablevision Director. Reifenheiser owns approximately 46,000 shares of Cablevision Class A stock. *See* Cablevision DEF 14A at 78, filed April 8, 2009.

27.     The term "Director Defendants" refers to Defendants C. Dolan, J. Dolan, K. Dolan, Dorsogna, Weber, P. Dolan, T. Dolan, Dolan-Sweeney, Sweeney, Araskog, Biondi, Carter, Ferris, Ryan, Tese, Tow and Reifenheiser.

28.     The term "Dolan Directors" refers to Defendants C. Dolan, J. Dolan, K. Dolan, Dorsogna, Weber, P. Dolan, T. Dolan, Dolan-Sweeney and Sweeney.

29.     The terms "Non-Dolan Directors" refers to Defendants Araskog, Biondi, Carter, Ferris, Ryan, Tese, Tow and Reifenheiser.

## SUBSTANTIVE ALLEGATIONS

30.    Reifenheiser is a director of Cablevision as well as a director of Citadel, Lamar and Mediacom. Because Cablevision competes with Citadel, Lamar and Mediacom, Reifenheiser is an interlocking director within the meaning of Section 8 and Cablevision and its Board are in violation of Section 8. Accordingly, Reifenheiser should be enjoined from simultaneously serving as a board member of Cablevision, Citadel, Lamar and Mediacom, and Cablevision should be enjoined from further violations of Section 8.

**A.    Cablevision Competes with Citadel, Lamar and Mediacom**

    **1.    Cablevision**

31.    Cablevision (including its subsidiaries) is the fifth largest cable operator in the United States based on the number of basic video subscribers. Cablevision also has ownership interests in, among others, companies that produce and distribute national and regional programming services and advertising, the Madison Square Garden sports, theatre and entertainment businesses, cable television advertising sales companies, telephone services and high-speed Internet access business, and the newspaper publishing business.

32.    For the year ended 2008, Cablevision reported total revenues of over $7.2 billion, for all of its numerous business segments, including cable, high-speed data, phone and advertising. The "competitive sales" of Cablevision, as that term is defined by Section 8 and as described herein, exceed the statutory minimums set out in Section 8.

33.    Cablevision classifies its business interests into four segments: Telecommunications Services; Rainbow; Madison Square Garden; and Newsday. All four categories generate substantial revenue from advertising, representing over 5% of the Company's total sales.

34.    <u>Telecommunications Services</u>. This segment includes cable television business

under the Optimum and iO brand names, including video, high-speed data, and Voice over Internet Protocol ("VoIP"). According to the Company's Annual Report for the year ended 2008, filed with the SEC on or about February 26, 2009: "We also derive revenues from the sale of advertising time available on the programming carried on our cable television systems." *Id.* at 51. According to the Company's 2008 Annual Report, Telecommunication Services represent 71% of the Company's total revenues for 2008. *Id.* at 51.

35.   Rainbow. This segment includes interests in national and regional television programming networks, including AMC, WE tv, IFC, Sundance Channel (as of June 16, 2008), and News 12. Rainbow also includes a local advertising sales representation business. According to the Company's 2008 Annual Report, fees in the Rainbow segment are earned from operators of cable, satellite and telephone systems and the *"second principal source of revenues in this segment is from advertising."* *Id.* at 52. According to the Company's 2008 Annual Report, Rainbow represents 14% of the Company's total revenues for 2008. *Id.* at 52. If even one quarter (25%) of Rainbow's revenues is derived from advertising – which is a reasonable assumption based, in part, upon the attention management has given to increases in advertising revenue in analyst conference calls throughout 2008 and 2009 – then advertising revenue from Rainbow alone represents 3.5% of the Company's total revenues for 2008.

36.   Madison Square Garden. This segment includes the Madison Square Garden Arena and the adjoining WaMu Theater at Madison Square Garden, the New York Knickerbockers professional basketball team, the New York Rangers professional hockey team, the New York Liberty professional women's basketball team, the Hartford Wolf Pack professional hockey team, the regional sports programming networks Madison Square Garden Network and MSG Plus, MSG Entertainment and others. According to the Company's 2008 Annual Report: "Our sports teams' financial success is dependent on their ability to generate

advertising sales, paid attendance, luxury box rentals, and food, beverage and merchandise sales." *Id.* at 54. In addition: "We also derive revenue from the sale of advertising at our owned and operated venues, from food, beverage and merchandise sales at these venues and from the licensing of our trademarks." *Id.* at 54. According to the Company's 2008 Annual Report, Madison Square Garden represents 14% of the Company's total revenues for 2008. *Id.* at 53.

37.    Newsday. This segment includes the Newsday daily newspaper, amNew York, Star Community Publishing Group, and online websites including newsday.com and exploreLI.com. According to the Company's 2008 Annual Report: "Newsday's revenue is derived primarily from the sale of advertising and the sale of newspapers . . . . For the period from July 30, 2008 through December 31, 2008, advertising revenues accounted for 81% of the total revenues of Newsday. *Id.* at 55. Newsday's financial success is largely dependent on advertising revenue." According to the Company's 2008 Annual Report, Newsday represents 2% of the Company's total revenues for 2008. *Id.* at 54. As a result, advertising revenue from Newsday alone represents 1.62% of the Company's total revenues for 2008.

**2.    Citadel**

38.    The combined capital, surplus and undivided profits of Citadel exceeds $25,841,000. Both Cablevision and Citadel engage in commerce. Both Cablevision and Citadel compete with one another in the sale of advertising.

39.    Citadel is a Delaware corporation with headquarter located at City Center West, Suite 400, 7201 West Lake Mead Blvd., Las Vegas, Nevada 89128. For the year ended 2008, Citadel reported revenues of over $860 million. The "competitive sales" of Citadel, as that term is defined by Section 8 and as described herein, exceed the statutory minimums set out in Section 8.

40.    Citadel is the third largest radio broadcasting company in the United States based

on net broadcasting revenue. The Company operates in two reportable segments. Radio stations serving the same geographic area (i.e., principally a city or combination of cities) that are owned and/or operated by Citadel are referred to as a market, and Citadel aggregates the geographic markets in which it operates into one reportable segment ("Radio Markets"). In addition to owning and operating radio stations, Citadel also owns and operates the ABC Radio Network ("Radio Network"), which produces and distributes a variety of radio programming and formats and syndicates across approximately 4,400 station affiliates and 8,500 program affiliations, and is a separate reportable segment. Substantially all of Citadel's revenues are derived from advertising.

41.    Radio Markets. As of February 19, 2009, Citadel owned and operated 165 FM and 58 AM radio stations, with a national footprint reaching more than 50 markets located in 27 states and the District of Columbia. According to Citadel's Annual Report for the year ended 2008, filed with the SEC on or about March 31, 2009, the Radio Markets generate "*substantially all of their revenue from the sale of advertising*" to local, regional and national spot advertisers. Citadel has a well-clustered radio station portfolio that is diversified by programming formats, geographic regions, audience demographics and advertising clients. *Id.* at 5 (emphasis added). Citadel faces more competition in the larger markets that rank in the top 20 in the country based on total market revenue.

42.    Radio Network. The Radio Network business produces and distributes a variety of programs and formats to affiliates, including syndicated talk and music programs. The Radio Network business provides its affiliates with selected proprietary and syndicated content, including *ABC News*, the ESPN, nine 24-hour music formats and targeted programming for urban and Hispanic formatted stations, enabling affiliates to meet their programming needs on a cost-effective basis. Citadel is also the exclusive sales representative for the ESPN Radio

Network content, providing both sales and distribution services. According to Citadel's 2008 Annual Report, the Radio Network business generates "*substantially all of its revenue from the sale of advertising*" time accumulated from its affiliate stations. *Id.* at 6 (emphasis added). The Radio Network divides the aggregated inventory into packages focused on specific demographic groups and sold to its advertiser clients who want to reach the listeners who comprise those demographic groups. The Radio Network business has 15 targeted advertising networks, which offer advertisers the opportunity to efficiently reach a variety of demographic groups on a national basis. By purchasing airtime on a network basis rather than station by station, advertisers are able to efficiently and effectively reach their desired demographic on a national and regional basis.

43.     According to Citadel's 2008 Annual Report, Citadel operates in a "highly competitive industry" where its radio stations compete for "audiences and advertising revenue directly with other radio stations as well as with other media, such as broadcast television, newspapers, magazines, cable television, satellite television, satellite radio, the Internet (and Internet radio), outdoor advertising and direct mail within their respective markets." *Id.* at 10-11.

44.     Citadel prohibits its directors from conflicts of interest and/or working for or serving as a director of a competitor.

45.     Reifenheiser became a member of the board of Citadel in 2007. He is also a member of Citadel's Audit Committee. According to Citadel's Code of Business Conduct and Ethics ("Citadel's Code") (available on Citadel's website: www.citadelbroadcasting.com), Citadel directors are expected to comply with all "applicable laws, rules and regulations, including both their specific provisions and their intended purpose." Citadel's Code reminds directors that "it is important to be aware of the applicable laws so that you can determine when to seek advice from, in the case of directors, the Company's General Counsel or outside legal

12

counsel...." Citadel Code, para. 1. Citadel's Code states that directors owe "a duty of loyalty to the Company," and that they must avoid "conflicts of interest." *Id.*, at para. 2. The Code warns employees (including officers) that they may not have "other outside employment or business interests that place them in the position of: . . . *providing goods or services substantially similar to those the Company provides* or is considering making available . . . ." *Id.*, at para. 2 (emphasis added). Finally, Citadel's Code warns directors that they *"should not enter into or invest in any endeavor in the Company's line of business or any complementary business without the Company's prior written consent."* *Id.*, at para. 3 (emphasis added). Reifenheiser owns approximately 46,000 shares of Cablevision Class A stock.

46.     Citadel's Corporate Governance Guidelines expressly state that Citadel "expects its directors to acknowledge their adherence to the Company's Code of Business Conduct and Ethics." Corporate Governance Guidelines, III (D). According to Citadel, "[i]f any actual or potential conflict of interest involving a director arises ... the director shall promptly inform the Chief Executive Officer and the other non-management directors." *Id.* Citadel also tells its directors that "Service on boards and/or committees of other organizations should be consistent with the Company's conflict of interest policies." *Id.* at I(E).

### 3.     Lamar

47.     The combined capital, surplus and undivided profits of Lamar exceeds $25,841,000. Both Cablevision and Lamar engage in commerce. Both Cablevision and Lamar compete with one another in the sale of advertising.

48.     Lamar is a Delaware corporation with headquarters located at 5551 Corporate Blvd., Baton Rouge, Louisiana, 70808. For the year ended 2008, Lamar reported revenues of nearly $1.2 billion. The "competitive sales" of Lamar, as that term is defined by Section 8 and as described herein, exceed the statutory minimums set out in Section 8.

49.     Lamar is one of the largest outdoor advertising companies in the United States based on number of displays and has operated under the Lamar name since 1902. Substantially all of its revenue is generated from the sale of advertising. As of December 31, 2008, Lamar owned and operated approximately 159,000 billboard advertising displays in 44 states, Canada and Puerto Rico, over 100,000 logo advertising displays in 19 states and the province of Ontario, Canada, and operated over 29,000 transit advertising displays in 17 states, Canada and Puerto Rico. Lamar offers its customers a fully integrated service, satisfying all aspects of their billboard display requirements from ad copy production to placement and maintenance. Lamar operates three types of outdoor advertising displays: billboards, logo signs and transit advertising displays.

50.     According to Lamar's Annual Report for the year ended 2008, filed with the SEC on or about February 27, 2009, the outdoor advertising industry is fragmented and is "comprised of several large outdoor advertising and media companies with operations in multiple markets." Among Lamar's competitors are: "Other forms of media, such as broadcast and cable television, radio, print media, direct mail marketing, telephone directories and the Internet." *Id.* at 8.

51.     Lamar prohibits its directors from conflicts of interest and/or working for or serving as a director of a competitor. According to Lamar's Corporate Governance Guidelines (available at www.lamar.com):

> Board members must be able to dedicate the time and resources sufficient for the diligent performance of their duties on the Company's behalf and should not hold positions that conflict with their responsibilities to the Company. If a director has any concerns about whether serving as a director of another company or other third party commitments might conflict with his or her duties to the Company, the director should consult the Chair of the Audit Committee in advance of accepting such commitment and inform the full committee of the outcome of that consultation.

*Id.* at 1.

14

### 4.   Mediacom

52.    The combined capital, surplus and undivided profits of Mediacom exceeds $25,841,000. Both Cablevision and Mediacom engage in commerce. Both Cablevision and Mediacom compete with one another in the video, high-speed data, phone and advertising businesses.

53.    Mediacom is a Delaware corporation with headquarters located at 100 Crystal Run Road, Middletown, New York 10941. According to Mediacom's Annual Report for the year ended 2008, filed with the SEC on or about March 16, 2009, Mediacom reported revenues of over $1.4 billion, of which over $1 billion was attributed to video, high-speed data and phone service, and $66 million (or 4.7%) was attributed to advertising. *Id.* at 40. The "competitive sales" of Mediacom, as that term is defined by Section 8 and as described herein, exceed the statutory minimums set out in Section 8.

54.    Mediacom is the eighth largest cable company in the United States based on the number of basic video subscribers. In addition to basic cable services, Mediacom also offers video-on-demand, high-definition television, digital video recorders, high-speed data internet and phone service. Over 65% of its basic cable subscribers are in the top 100 television markets in the United States, with about 55% in the top 50-100 markets.

55.    In addition to generating revenue from its cable service, Mediacom also generates revenue from selling advertising time to local, regional and national advertisers. According to Mediacom's 2008 Annual Report: "In some of these markets, we represent the advertising sales efforts of other cable operators; in other markets, other cable operators represent us. Additionally, national and regional interconnect agreements have been negotiated with other cable system operators to simplify the purchase of advertising time by our clients." *Id.* at 8.

15

56.    Mediacom prohibits its directors from conflicts of interest and/or working for or serving as a director of a competitor.

**B.    THE DIRECTOR DEFENDANTS NOMINATED AND ENDORSED AN ILLEGAL INTERLOCKING DIRECTOR**

57.    On or about April 8, 2009, Cablevision disseminated to its shareholders and filed with the SEC a definitive proxy (the "2009 Proxy").

58.    According to the 2009 Proxy, members of the Cablevision Board are elected for one-year terms.

59.    According to the 2009 Proxy, the Company's Board does not have a nominating committee or any subcommittee of the Board that reviews the qualifications and lawfulness of any potential candidate for service on the Company's Board.  According to the 2009 Proxy:

> Our directors have not set specific, minimum qualifications that nominees must meet in order for them to be nominated for election to the Board, but rather believe that each nominee should be evaluated based on his or her individual merits, taking into account, among other matters, the factors set forth in our Corporate Governance Guidelines under "Board Composition" and "Selection of Directors."

2009 Proxy at 10-11.

60.    According to the Company's Corporate Governance Guidelines (available at www.cablevision.com), under the section entitled "Selection of Directors," the Board considers the following criteria when selecting new nominees for election to the Board:

- The recommendations of the directors elected by the holders of the Company's Class A Common Stock and Class B Common Stock, as the case may be;

- Personal qualities and characteristics, accomplishments and reputation in the business community;

- Current knowledge and contacts in the communities in which the Company does business and in the Company's industry or other industries relevant to the Company's business;

- Ability and willingness to commit adequate time to Board and

16

committee matters;

- The fit of the individual's skills and personality with those of other directors and potential directors in building a Board that is effective, collegial and responsive to the needs of the Company; and

- Diversity of viewpoints, background and experience.

Corporate Governance Guidelines at 1-2.

61.    The Company's Corporate Governance Guidelines, under a section entitled "Expectations of Directors," also states:

> 3. *Loyalty and Ethics*. In their roles as directors, all directors owe a duty of loyalty to the Company. This duty of loyalty mandates that the best interests of the Company take precedence over any interests of a director.
>
> The Company has adopted a Code of Business Conduct and Ethics. Certain portions of the Code deal with activities of directors. Directors should be familiar with the Code and should consult with an Applicable Ethics Officer in the event of any issues.
>
> 4. *Other Directorships*. The Company values the experience directors bring from other boards on which they serve, but recognizes that those boards may also present demands on a director's time and availability and may present conflicts or legal issues.  Directors should advise the Chairman of the Board and the CEO before accepting membership on other boards of directors or other significant commitments involving affiliation with other businesses or governmental units.

Corporate Governance Guidelines at 1-2.

62.    According to the Company's Code of Business Conduct and Ethics (available at www.cablevision.com):

> The Company's success has always been based upon hard work and honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each employee, officer and director should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

Code of Business Conduct and Ethics at 6.

17

63.     On or about April 8, 2009, Cablevision disseminated the 2009 Proxy to its shareholders seeking their vote on the election of the directors. The 2009 Proxy indicated that the Board had nominated for re-election to the Board all seventeen of its directors, including Reifenheiser, and unanimously recommended that shareholders vote "FOR" their re-election. The shareholder vote was to take place at the annual meeting of shareholders to be held on May 21, 2009. All seventeen directors were re-elected to the Cablevision Board.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties.

65.     Plaintiff owns Cablevision common stock and has owned such stock since 2004.

66.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

67.     The Cablevision Board currently consists of the seventeen (17) Director Defendants. The nine (9) Dolan Directors represent a majority of the Board. The Dolan Directors are members of the Dolan family. According to the Company's 2008 Annual Report, the Company is "controlled by the Dolan family" as a result of their 100% ownership of the Company's Class B common stock, which entitles such holders to ten votes per share and includes the right to elect 75% of the Cablevision's Board. Class A common stock holders are entitled to one vote per share and may elect the remaining 25% of Cablevision's Board. As a result, of the seventeen Board members, eleven are to elected by the Class B stockholders (i.e., the Dolan family) and six are to be elected by the Class A stockholders.

68.     According to the Company's 2008 Annual Report:

As of February 20, 2009, the Dolan family, including trusts for the benefit of members of the Dolan family, collectively owned all of Cablevision's Class B common stock, less than 3% of Cablevision's outstanding Class A common stock and approximately 70% of the total voting power of all the outstanding

Cablevision common stock. Of this amount, our Chairman, Charles F. Dolan, beneficially owned approximately 46% of Cablevision's outstanding Class B common stock, less than 1% of Cablevision's outstanding Class A common stock and approximately 32% of the total voting power of all the outstanding Cablevision common stock. The members of the Dolan family holding Class B common stock have executed a voting agreement that has the effect of causing the voting power of the Class B stockholders to be cast as a block with respect to the election of the directors elected by the Class B stockholders and any change of control transaction. The Dolan family is able to prevent a change in control of Cablevision and no person interested in acquiring Cablevision will be able to do so without obtaining the consent of the Dolan family. . . .

As a result of the Dolan family's ownership of all of the Class B common stock, the Dolan family has the power to elect all the directors of Cablevision subject to election by holders of Class B common stock. Those directors constitute a majority of Cablevision's board of directors. In addition, Dolan family members may control stockholder decisions on matters in which holders of all classes of Cablevision common stock vote together as a single class. These matters could include the amendment of some provisions of Cablevision's certificate of incorporation and the approval of fundamental corporate transactions. In addition, the affirmative vote or consent of the holders of at least 66-2/3% of the outstanding shares of the Class B common stock, voting separately as a class, is required to approve the authorization or issuance of any additional shares of Class B common stock. Furthermore, the Dolan family members also have the power to prevent any amendment, alteration or repeal of any of the provisions of Cablevision's certificate of incorporation that adversely affects the powers, preferences or rights of the Class B common stock.

One purpose of the voting agreement referred to above is to consolidate Dolan family control of Cablevision. The Dolan family requested Cablevision's Board of Directors to exercise Cablevision's right, as a "controlled company", to opt-out of the New York Stock Exchange listing standards that, among other things, require listed companies to have a majority of independent directors on their board and to have an independent corporate governance and nominating committee. Cablevision's Board of Directors and the directors elected by holders of Class A common stock each approved this request on March 8, 2004.

69.    Defendant J. Dolan recently confirmed that the Dolan Directors control and dominate the Company.  On January 6, 2010, during the Citi Global Entertainment, Media, and Telecommunications Conference, Defendant J. Dolan responded to a question regarding the nature of the Company and confirmed that it is run like a "private company."  According to FD Wire, the following exchange took place:

19

JASON BAZINET: . . . All right, I have a second sort of high-level question regarding management philosophy. Maybe this is misguided but when I sort of listen to the buy side out there, a lot of them viewed Cablevision for many years as a company that was almost run like a private company. And more recently there's been really a sea change among the investment community where more and more people feel like Cablevision is being run like a public company.

Is this a misinterpretation of what sort of happened internally at Cablevision? Is that something real that has change? If so, why?

JIM DOLAN: I don't think that the Company has really changed that much. It is a Company with a control shareholder and like a private company, we look at building long-term value. I think this is true really of any company that has a control shareholder or is a private company. They are looking more directly at the business and what's really good for the business and what will be good for the business down the road, focusing less on the quarterly earnings reports. So then you end up making decisions like building networks and offering products with a lot of value in it, trying to go for deep penetrations versus trying to squeeze our every dime of margins so that your quarterly earnings call is better.

70.     The Dolan Directors thus control and dominate the Company, the Board and the appointment of a majority of the Board's members. As a result, a majority of the current Cablevision Board is not independent with respect to evaluating the Board's ongoing violations of Section 8. In addition, the Non-Dolan Directors receive substantial fees and compensation from Cablevision and, as a result, cannot exercise independent judgment with respect to the void nomination and shareholder vote of an illegal interlock. Accordingly, a pre-suit demand on the current Board is excused.

71.     All seventeen of the Director Defendants committed a void and *ultra vires* act when they nominated and endorsed for Board membership an interlocking director in violation of Section 8. This nomination and endorsement is a per se violation of the U.S. antitrust laws. It was beyond the authority of any board of directors and cannot be ratified by the Company's shareholders. Accordingly, in these circumstances – when allegations of *ultra vires* board action have been made – the law of the state of Delaware clearly states that a pre-suit demand "will be excused if a majority of the board that allegedly pursued the *ultra vires* action remains on the

20

defendant board at the time demand is made." *In re InfoUSA, Inc.*, 953 A.2d 963, 988 (Del. Ch. 2007).

72.     Because a majority of the Board (indeed, the entire Board) committed these *ultra vires* acts a pre-suit demand is excused and no further analysis or allegation concerning Defendants' wrongdoing, mental state or culpability is required to excuse such pre-suit demand. Nevertheless, it is clear that the Director Defendants were knowingly and/or recklessly indifferent to their Section 8 violations and acted with intent, gross negligence and/or bad faith when they nominated and endorsed an illegal interlocking director to serve on the Cablevision Board.  Evidence of Defendants' culpable wrongdoing is substantial:

a)     First, the board knowingly and intentionally nominated an individual that simultaneously sits on the boards of competing companies.  Indeed, the Director Defendants knew that Reifenheiser sits on the boards of Citadel, Lamar and Mediacom and that those companies compete with Cablevision.  That knowledge is based on the Company's own public filings which indicate that Reifenheiser is a sitting director of three companies that engage in businesses that compete with Cablevision.

b)     Second, in evaluating candidates for nomination to the Board, the Director Defendants failed to consider a fundamental question: whether the prospective nominee complies with the U.S. antitrust laws prohibiting interlocking directors.  Indeed, the stated criteria which the Director Defendants applied to the nomination process did not include an analysis of whether the nominees are illegal interlocks or whether their nomination even comports with applicable federal law.  As a result, the Director Defendants failed to properly inform themselves of the propriety of their actions.

c)     Third, by nominating an illegal interlocking director, the Director Defendants failed to abide by their duty of loyalty to act solely in the best interest of the

Company. The Director Defendants failed to address the inherent conflict of interest that arises when one individual serves on the boards of two or more competing companies. By doing so, they not only violated their duty of loyalty, but their own Code of Business Conduct and Ethics which prohibits illegal and anti-competitive behavior.

      d)     Fourth, despite the directives contained in the Company's Corporate Governance Guidelines, the Director Defendants took no action to consult with the Applicable Ethics Officer or inform the Chairman or CEO of the fact that a member of the Board suffered from a conflict of interest, was an illegal interlocking director within the meaning of Section 8 and that the Company was in continuing violation of the U.S. antitrust laws.

73.     In light of the foregoing, a pre-suit demand is excused.

## COUNT ONE

## VIOLATION OF SECTION 8 OF THE CLAYTON ACT

74.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

75.     Section 8 of the Clayton Act, 15 U.S.C. § 19, prohibits a person from serving, at the same time, as a director or officer of two or more corporations, other than banks, banking associations, and trust companies if: (1) the combined capital, surplus and undivided profits of each of the corporations exceeds $10,000,000 (or as of January 19, 2010, $25,841,000); (2) each corporation is engaged in commerce; and, (3) the corporations are competitors. Cablevision and Citadel, Cablevision and Lamar, and Cablevision and Mediacom all meet these statutory requirements and none of the exemptions from Section 8 apply here.

76.     Reifenheiser currently serves as a director of both Cablevision and Citadel and is in violation of Section 8 because:

      a)     Cablevision and Citadel each have a combined capital, surplus and undivided profit exceeding $25,841,000.

b)      Cablevision and Citadel are each engaged in commerce.

c)      Cablevision and Citadel are competitors, such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws. Pursuant to 15 U.S.C. § 26, Reifenheiser should be enjoined from continuing to serve on the boards of both companies, namely Cablevision and Citadel.

77.     Reifenheiser currently serves as a director of both Cablevision and Lamar and is in violation of Section 8 because:

a)      Cablevision and Lamar each have a combined capital, surplus and undivided profit exceeding $25,841,000.

b)      Cablevision and Lamar are each engaged in commerce.

c)      Cablevision and Lamar are competitors, such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws. Pursuant to 15 U.S.C. § 26, Reifenheiser should be enjoined from continuing to serve on the boards of both companies, namely Cablevision and Lamar.

78.     Reifenheiser currently serves as a director of both Cablevision and Mediacom and is in violation of Section 8 because:

a)      Cablevision and Mediacom each have a combined capital, surplus and undivided profit exceeding $25,841,000.

b)      Cablevision and Mediacom are each engaged in commerce.

c)      Cablevision and Mediacom are competitors, such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws. Pursuant to 15 U.S.C. § 26, Reifenheiser should be enjoined from continuing to serve on the boards of both companies, namely Cablevision and Mediacom.

79.     Cablevision, Citadel, Lamar and Mediacom exceed the statutory minimums

contained in 15 U.S.C. § 19(a)(2)(A)-(C) in that: (a) the competitive sales of each of the four corporations is greater than $1,000,000 (or as of January 19, 2010, $2,584,100); (b) the competitive sales of each of the four corporations is greater than 2% of each corporation's total sales; and, (c) the competitive sales of at least one of the four corporations is greater than 4% of that corporation's total sales.

80.     The Court should: (i) issue an injunction requiring the Cablevision Board to remove Reifenheiser from the Board, or to otherwise cure the present violation of Section 8; (ii) enjoin Reifenheiser from continuing to serve on the Cablevision Board; or, (iii) enjoin Cablevision and/or the Cablevision Board (as presently constituted and as it may be constituted in the future) from committing future violations of Section 8 because, for the reasons stated above, there is a strong likelihood of continued violations of Section 8.

## COUNT TWO

## BREACH OF FIDUCIARY DUTY

81.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

82.     As alleged herein, each of the Director Defendants had a fiduciary duty to, among other things, exercise good faith and loyalty to ensure that Cablevision was operated in a diligent, honest and prudent manner and complied with all applicable federal laws.

83.     The Director Defendants knowingly and/or recklessly, and in violation of their duty of loyalty, violated Section 8 when they nominated and endorsed for re-election Reifenheiser to the Cablevision Board.  In doing so, the Director Defendants breached their fiduciary duties to Cablevision and its shareholders, namely, the duties of due care, good faith, candor, and loyalty.

84.     Furthermore, despite their actual knowledge of the Company's improper business practices, the Director Defendants have made no effort to correct the problems and have thus

24

allowed Reifenheiser to continue to serve on the Board in violation of Section 8; thus, they abdicated their fiduciary duty of good faith.

85.     As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, they have violated and caused the Company to violate Section 8. The Cablevision Board should be enjoined from violating Section 8. Alternatively, the Court should enjoin Reifenheiser from continuing to serve as a director on the Cablevision Board. The Court should issue an injunction requiring the Cablevision Board to remove Reifenheiser from the Cablevision Board, or to otherwise cure the present violation of Section 8. The Court should also issue an injunction barring the Cablevision Board (as presently constituted and as it may be constituted in the future) from all future violations of Section 8 because, for the reasons stated above, there is a strong likelihood of continued violations of Section 8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands:

A.     That the Cablevision Board (as presently constituted or as it may be constituted in the future) be preliminarily and permanently enjoined such that the Board is directed to remove the subject interlock or otherwise cure the violation by requiring the subject interlock to resign from his directorships on the boards of Citadel, Lamar and/or Mediacom. Alternatively, Plaintiff demands that the Court enjoin Reifenheiser from continuing to serve as a director on the Cablevision Board.

B.     That the Defendants be preliminarily and permanently enjoined from future violations of Section 8 and that the Cablevision Board be ordered to establish a procedure whereby future elections and appointments of officers and directors in violation of Section 8 are identified and restricted.

C.     That the Court award Plaintiff the cost of this suit, including reasonable attorneys'

fees as authorized under 15 U.S.C. § 26 and the common law, and

      D.     That the Court order such other and further relief as may appear necessary and

appropriate.

      Dated: January 29, 2010

**SARRAF GENTILE LLP**

Ronen Sarraf
Joseph Gentile
116 John Street, Suite 2310
New York, New York 10038
T: 212-868-3610
F: 212-918-7967

**VIANALE & VIANALE LLP**
Kenneth J. Vianale
(A Member of the Bar of this Court)
2499 Glades Road, Suite 112
Boca Raton, Florida 33431
T: 561-392-4750
F: 561-392-4775

*Counsel for Plaintiff*

## Verification

Pursuant to 28 U.S.C. § 1746 and the requirements of Federal Rule of Civil Procedure 23.1, the undersigned verifies under penalty of perjury that the statements set forth in the foregoing VERIFIED DERIVATIVE COMPLAINT are true and correct to the best of his knowledge.

Date: January 26, 2010

RONALD GROSS

By: _Ron Gross_
Ronald Gross